******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KEITH CHEMLEN
(AC 37429)

Lavine, Alvord and Prescott, Js.

*Argued March 14—officially released May 31, 2016*

(Appeal from Superior Court, judicial district of Waterbury, geographical area number four, Crawford, J.)

*Jodi Zils Gagne*, for the appellant (defendant).

*Lisa Herskowitz*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Marc G. Ramia*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Keith Chemlen, appeals from the judgment of conviction, rendered after a jury trial, of forgery in the second degree in violation of General Statutes § 53a-139 (a) (3), and larceny in the third degree in violation of General Statutes § 53a-124 (a) (2). The defendant subsequently pleaded guilty to being a persistent serious felony offender in violation of General Statutes § 53a-40 (c), as charged in a part B information. On appeal, the defendant claims that (1) the trial court improperly excluded extrinsic evidence to impeach a state's witness; (2) his constitutional rights to due process and a fair trial were violated by the prosecutor's failure to correct the false testimony of a state's witness; and (3) the court improperly denied his motion for a judgment of acquittal on the basis of insufficiency of the evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Daniel Brenes is the owner and sole officer of Global International, Inc., which is registered in Connecticut under the name of National Credit Masters. National Credit Masters performs credit repair services, including reviewing a client's credit report, analyzing any negative information contained therein, and developing a plan to remove any negative information. National Credit Masters does not negotiate or settle debt obligations to creditors.

Brenes met the defendant in 2005 or 2006 at a business meeting. Subsequent to that initial encounter, Brenes and the defendant crossed paths at bars and in the surrounding area. Although Brenes' knowledge of the defendant was limited—he only knew the defendant's first name—he came to believe that the defendant was a great salesman. Thus, when the defendant applied for an open sales associate position at National Credit Masters in December, 2012, Brenes offered him an interview.

During the interview, Brenes asked the defendant for identification so that he could perform a background check. The defendant provided Brenes with a state issued identification card on which was the name "Keith David." Brenes made a copy of the identification card and then returned it to the defendant. Brenes subsequently hired the defendant, whom he believed to be Keith David. The defendant began working at National Credit Masters in February, 2013. Brenes gave the defendant a training manual and instructed him that the company e-mail account was the only e-mail account to be used to contact clients. Brenes also told the defendant that clients could not pay their fees in cash and that he was not to settle debt obligations with creditors.

In June or July, 2013, several people began stopping by National Credit Masters' office and claiming that

they were clients, although Brenes had no knowledge of them. In one instance, Brenes received a telephone call from Michelle Garcia, who claimed to be a client of National Credit Masters. Garcia told Brenes that the defendant had arranged for Robert Nichols, an attorney and Brenes' landlord, to represent her on a debt-defense case. Brenes arranged a meeting between himself, Garcia, and Nichols, during which Nichols informed her that he never had represented any of National Credit Masters' clients and had not agreed to represent her.

By the date of the meeting between Brenes, Garcia, and Nichols, the defendant had stopped coming into work and claimed to have a stomach virus. As time went on, the defendant failed to return Brenes' telephone calls, and Brenes began to call clients to confer on the status of their credit repairs. Through these calls, Brenes discovered that the defendant had violated company procedures by charging clients for debt negotiation and settlement, and by offering legal advice. Brenes terminated the defendant's employment and notified the police of these revelations.

Detective Randy Watts of the Waterbury Police Department spoke with Brenes, Garcia, and nine other people who had been clients of the defendant. Through these interviews, it came to light that the defendant, in contravention of company policy, had accepted payments from clients, which National Credit Masters never received, in cash and through PayPal in his name. In exchange for these payments, the defendant had promised clients that he would negotiate and settle their debts and would remove negative information from their credit reports. Such promises often were not kept. In some instances, clients paid the defendant in cash or through a PayPal account linked to the defendant's personal e-mail to remove negative information from their credit reports. The defendant sent these clients fake credit reports from a personal e-mail address, showing that their credit scores had been improved, but, in actuality, their credit reports remained the same. In other instances, clients paid the defendant in cash to settle their debts. The defendant told these clients that the debts had been settled and paid, but, in actuality, the defendant never negotiated the debt amounts or paid the creditors. Additionally, all of the clients knew the defendant as "Keith" or "Keith David." The defendant's real name was not "Keith David" but, rather, was "Keith David Chemlen."

On August 13, 2014, in an amended long form information, the defendant was charged with two counts of forgery in the second degree in violation of § 53a-139 (a) (3),[1] and one count of larceny in the third degree in violation of § 53a-124 (a) (2).[2] In the amended information, the state alleged that the defendant committed forgery in the second degree by altering a state issued identification card with the intent to defraud and

deceive Brenes, and by possessing a state issued identification card that he knew to be altered with the intent to deceive Brenes. The state further alleged that the defendant committed larceny in the third degree by wrongfully obtaining money from clients by false promises to repair credit scores and settle debts.

On August 19, 2014, a jury found the defendant guilty of all three counts. He subsequently pleaded guilty to being a persistent serious felony offender in violation of § 53a-40 (c), pursuant to a part B information. On October 10, 2014, at sentencing, the court vacated the verdict on the second count[3] of forgery in the second degree and imposed a total effective sentence of fifteen years of incarceration, execution suspended after seven years, followed by five years of probation with special conditions. This appeal followed. Additional facts will be set forth as required.

I

The defendant first claims that the court improperly excluded extrinsic evidence that would have impeached Brenes by contradicting his statement that he did not know the defendant's last name at the time that he hired him. Specifically, he argues that he should have been allowed to impeach Brenes' testimony with extrinsic evidence of prior inconsistent statements because it related to a noncollateral matter, namely, whether he had the intent to deceive Brenes, as required to prove forgery in the second degree, if Brenes knew his last name at the time he hired him. The state responds that the court properly excluded the evidence at issue because it was unreliable, lacked authenticity, and would have confused the jury. We agree with the state.

The following additional facts and procedural history are relevant to this claim. At trial, Brenes testified for the state that although he had met the defendant as early as 2005 or 2006, he did not know that the defendant's last name was "Chemlen" at the time that he hired him. Rather, he believed, on the basis of the identification card shown to him by the defendant, that the defendant's last name was "David."

On cross-examination, Brenes testified that he had a post office box, but he had not authorized the defendant or DK Management, LLC, a limited liability company of which the defendant was the agent, to use it. Defense counsel showed Brenes two documents, which were marked for identification purposes only, in an attempt to establish that the defendant and Brenes had been in business together as early as 2008. The first document, defense exhibit A, was the articles of organization for DK Management, LLC. The articles of organization purported to show that both the defendant, whose full name was listed, and Brenes were members of DK Management, LLC, on March 24, 2008. The document, however, was signed only by the defendant, and Brenes

testified that he had never been a member of DK Management, LLC. The defendant did not offer the articles of organization into evidence as a full exhibit.

The second document, defense exhibit B, consisted of two applications for a post office box. On one of the post office box applications, dated January 29, 2008, both DK Management, LLC, and Brenes' name appeared. Brenes testified that he did not place DK Management, LLC, on the 2008 application. Only Brenes' name appeared on the second post office box application, dated February 13, 2009. The defense did not ask Brenes whether he filled out either post office box application or whether his handwriting was contained on either application. The defendant did not offer the two applications into evidence as a full exhibit at this time.

After the state rested, the defendant attempted, in an often confusing fashion,[4] to establish that Brenes knew the defendant's correct last name at the time that he hired him. According to the defendant, if Brenes knew his last name, he could not have intended to deceive Brenes by providing him with an identification card containing an alias, as required to prove forgery in the second degree. The defendant sought to establish this fact by offering the testimony of Paul Bianca, a postmaster, and, through him, several documents relating to Brenes' post office box. The state initially objected to the admission of the documents on the grounds of relevancy and the inadmissibility of extrinsic evidence to impeach a witness. In an attempt to lay a foundation as to the admissibility of the documents, the defendant offered the testimony of Bianca outside the presence of the jury.

The documents that the defense sought to offer into evidence were marked for identification only as defense exhibits G, H, I, J, K (exhibits).[5] Defense exhibit G is identical to defense exhibit B. Defense exhibit J is only the 2008 application to open a post office box. The 2008 application states that the post office box is assigned to DK Management, LLC, and was applied for by Brenes. It is allegedly signed by Brenes.

Defense exhibit K is the 2009 application for a post office box. The 2009 application states that the post office box is assigned to Brenes and was applied for by Brenes. It purports to be signed by Brenes. The signature on the 2009 post office box application is drastically different from the signature on the 2008 post office box application.

When questioned concerning the two different post office box applications, Bianca testified that he was not the clerk who handled either application, and he could assume only that the 2009 application was actually an application to change the lock on the post office box, not an application to open a new post office box. Bianca,

however, conceded that nothing in exhibit K supported this assumption or established who filled out the application or signed it. Bianca also stated that an application to open a post office box has two pages, and both the 2008 post office box application and the 2009 post office box application were missing their second page.

Defense exhibit H is the second page of an electronic document from the United States Postal Service that lists additional names that have access to a particular post office box. The names listed are Keith Chemlen, Brenes Industries Group, DK Management, LLC, and National Credit Masters. The document does not indicate with which post office box the information is associated. It does indicate, however, that it is the second of two pages, and the first page was not provided.

Defense exhibit I is a handwritten note that was in a post office file concerning Brenes' post office box. The handwritten note states that Keith Chemlen is not permitted access to Brenes' post office box. The note is not dated, and the parties agreed that it was not written by Brenes. Bianca assumed, without firsthand knowledge, that it was written by a clerk.

Brenes never testified on direct or cross-examination that he had signed either post office box application or had the lock changed on his post office box. Additionally, Brenes was never shown or questioned about the handwritten note in his post office file or the electronic document from the United States Postal Service. During the defendant's attempt to have these documents admitted into evidence, however, the defendant argued that the 2008 post office box application, which listed DK Management, LLC, as the assignee of the post office box, could be linked to the articles of organization for DK Management, LLC, which listed both Brenes and the defendant by full name as members, and, thus, established that Brenes knew the defendant's last name before he hired him.

Throughout the defendant's lengthy attempt to have these exhibits admitted into evidence, the state made numerous objections and arguments concerning the inadmissibility of the exhibits. The state noted multiple authenticity concerns with the exhibits. For example, Bianca testified that he had no knowledge or documentation that could establish who filled out the 2008 and 2009 post office box applications or when the handwritten note was added to Brenes' post office file. Both post office box applications were missing their second page. There was no evidence that the signatures on the post office box applications belonged to Brenes. The electronic printout from the United States Postal Service, defense exhibit H, contained no information linking it to Brenes' post office box.

The state further argued that even if the applications were authentic, there was no evidence admitted in the

record that linked DK Management, LLC, to both the defendant and Brenes. Although DK Management, LLC, is listed on the 2008 post office box application, the defendant's name is not. The only document that links DK Management, LLC, to the defendant is the articles of organization (defense exhibit A), which was never offered by the defendant as a full exhibit and was only signed by the defendant, and, thus, does not prove that Brenes and the defendant were both associated with DK Management, LLC.

The court sustained the state's objection to the admission of the exhibits. Although the court agreed with the defendant's argument that the court had discretion to admit extrinsic evidence of a prior inconsistent statement pursuant to Connecticut Code of Evidence § 6-10, it, nevertheless, held that the exhibits were inadmissible because they were too confusing and lacked authenticity and reliability. The court based its holding on the fact that there were "too many gaps, too many question marks, too may assumptions that would have to be made to reach a conclusion" that Brenes knew the defendant's last name in 2008.

We begin by setting forth our standard of review. "[I]t is well settled that the trial court's evidentiary rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . When reviewing a decision to determine whether the trial court has abused its discretion, we make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Chief Information Officer* v. *Computers Plus Center, Inc.*, 310 Conn. 60, 97–98, 74 A.3d 1242 (2013).

As an initial matter, we address the defendant's contention that the exhibits were extrinsic evidence of prior inconsistent statements.[6] To be admissible as extrinsic evidence of a prior inconsistent statement under § 6-10 of the Connecticut Code of Evidence,[7] the proffered evidence must be a prior statement made by the witness that contradicts something that the witness has testified to at trial. See *State* v. *Ward*, 83 Conn. App. 377, 393–94, 849 A.2d 860, cert. denied, 271 Conn. 902, 859 A.2d 566 (2004). Our Supreme Court "[has] stated that [t]he impeachment of a witness by extrinsic evidence [of a prior inconsistent statement pursuant to § 6-10 of the Connecticut Code of Evidence] is somewhat limited. Not only must the inconsistent statements be relevant and of such a kind as would affect the credibility of the witness . . . but generally a foundation should be laid at the time of cross-examination." (Emphasis omitted; internal quotation marks omitted.) *Chief Information Officer* v. *Computers Plus Center, Inc.*, supra, 310

Conn. 118. To be relevant, the inconsistent statement must relate to a noncollateral matter, otherwise the statement must be excluded. See *State* v. *Diaz*, 237 Conn. 518, 548, 679 A.2d 902 (1996) (extrinsic evidence is not admissible to impeach witness "by contradicting his or her testimony as to collateral matters, that is, matters that are not directly relevant and material to the merits of the case" [internal quotation marks omitted]); *State* v. *Dudley*, 68 Conn. App. 405, 419, 791 A.2d 661 ("[a] matter is not collateral if it is relevant to a material issue in the case apart from its tendency to contradict the witness" [internal quotation marks omitted]), cert. denied, 260 Conn. 916, 797 A.2d 515 (2002). Even if these requirements are met, the admission of extrinsic evidence to impeach is within the court's broad discretion. See *State* v. *Dudley*, supra, 419; *State* v. *Smith*, 46 Conn. App. 285, 295, 699 A.2d 250, cert. denied, 243 Conn. 930, 701 A.2d 662 (1997).

In seeking their admission, the defendant appeared to characterize the exhibits at trial as prior inconsistent statements, i.e., impeachment evidence, to refute Brenes' prior testimony that he did not know the defendant's last name. On the basis of the defendant's offer, the court ruled on the admissibility of the exhibits on the ground that they were extrinsic evidence of prior inconsistent statements under § 6-10 (c) of the Connecticut Code of Evidence. The court implicitly found that the exhibits were prior inconsistent statements on a noncollateral issue,[8] and, thus, the court proceeded on the assumption that it was within its discretion to admit them. See *State* v. *Dudley*, supra, 68 Conn. App. 419 (court had broad discretion to admit extrinsic evidence of prior inconsistent statement). The court specifically stated that it was exercising its discretion to exclude the exhibits because they lacked authenticity and reliability and would have confused the jury.

Not all of the exhibits, however, can be construed properly as prior statements by Brenes that contradict his testimony at trial. The only exhibit that arguably contains evidence of a prior inconsistent statement made by Brenes is the 2008 post office box application because it states that Brenes applied for a post office box for the use of DK Management, LLC. If true, this statement tends to establish that Brenes was associated with DK Management, LLC, in 2008. Brenes, however, testified that he had no connection to DK Management, LLC. Thus, the two statements contradict each other.

The other exhibits contain no such potentially inconsistent statements made by Brenes. The 2009 post office box application contains no statement by Brenes that establishes that he was associated with DK Management, LLC, or knew the defendant's last name at that time. Although the articles of organization, the handwritten note in Brenes' post office file, and the electronic record from the United States Postal Service

contain both the defendant's full name and Brenes' name, they are not even purportedly signed by Brenes and, thus, cannot be classified, without more, as prior statements made by Brenes. Although not evidence of prior inconsistent statements, these exhibits are arguably relevant nonetheless to a material issue, namely, whether the defendant had the intent to deceive Brenes as required by § 53a-139 (a) (3) if he thought that Brenes knew his name when he provided Brenes with the altered identification card. See Conn. Code Evid. § 4-1.[9]

The fact that some of the exhibits are not prior inconsistent statements, however, does not entirely dispose of our review of the trial court's decision to exclude the exhibits on the basis of confusion and lack of authenticity. In exercising its broad discretion to admit evidence, whether categorized as extrinsic evidence of a prior inconsistent statement or simply as evidence relevant to a material issue, the court may exclude evidence if its probative value is outweighed by other considerations. For example, relevant evidence may be excluded if its probative value is outweighed by the confusion it would cause. See Conn. Code Evid. § 4-3;[10] *Ancheff* v. *Hartford Hospital*, 260 Conn. 785, 804, 799 A.2d 1067 (2002) ("[s]ection 4-3 . . . recognizes the court's authority to exclude relevant evidence when its probative value is outweighed by factors such as confusion of the issues or misleading the jury" [internal quotation marks omitted]). "As we have stated, [o]ne of the chief roles of the trial judge is to see that there is no misunderstanding of a witness's testimony. The judge has a duty to comprehend what a witness says as much as it is his duty to see that the witness communicates with the jury in an intelligible manner. A trial judge can do this in a fair and unbiased way. His attempt to do so should not be a basis [for] error. Where the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion." (Internal quotation marks omitted.) *Farrell* v. *St. Vincent's Hospital*, 203 Conn. 554, 563–64, 525 A.2d 954 (1987).

Furthermore, in determining whether to admit into evidence a writing, the court may consider the authenticity of the evidence. Pursuant to § 9-1 of the Connecticut Code of Evidence,[11] "[a]uthentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . . Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of

authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which ultimately will determine its authenticity. . . . The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." (Internal quotation marks omitted.) *State* v. *Cooke*, 89 Conn. App. 530, 548, 874 A.2d 805, cert. denied, 275 Conn. 911, 882 A.2d 677 (2005). One manner by which a document can be authenticated is by proof that the document is signed and the signature is verified either by the signer, a witness to the signing, or comparison to the alleged signer's known signature. See *Shulman* v. *Shulman*, 150 Conn. 651, 657, 193 A.2d 525 (1963); *Tyler* v. *Todd*, 36 Conn. 218, 222 (1869).

Although not all of the exhibits that the defendant sought to admit are characterized properly as evidence of prior inconsistent statements, the essence of the defendant's argument in favor of admitting the exhibits is unaffected. The defendant argues that the exhibits should have been admitted into evidence because they were relevant to whether he had the intent to deceive Brenes, as required to prove forgery in the second degree. According to the defendant, if Brenes knew his last name at the time that he hired him, Brenes could not be deceived by the altered identification card.

Contrary to the defendant's contention, the exhibits have little to no probative value concerning whether he had the requisite intent to deceive Brenes. The defendant contends that the exhibits establish that he did not intend to deceive Brenes because Brenes could not be deceived if he already knew the defendant's name. Whether Brenes was in fact deceived, however, is not an element of forgery in the second degree in violation of § 53a-139 (a) (3). See *State* v. *Dickman*, 119 Conn. App. 581, 588–89, 989 A.2d 613, cert. denied, 295 Conn. 923, 991 A.2d 569 (2010); part III A of this opinion. The belief of the victim is immaterial under § 53a-139 (a) (3); the only intent that matters is the intent of the defendant. *State* v. *Dickman*, supra, 589.

To the extent that the defendant argues that the exhibits establish that he did not have the intent to deceive Brenes because he believed that Brenes knew his last name when he hired him, the exhibits have minimal probative value. Even if Brenes knew the defendant's last name and placed it on the electronic record and the handwritten note as early as 2008, there is no evidence that the defendant knew at the time he presented the altered identification card to Brenes that Brenes had done so. No additional evidence was offered by the defendant to buttress the reliability of the exhibits or to relate them to the defendant's alleged understanding that Brenes knew his last name when he hired him.

Even assuming that the exhibits have probative value, the trial court found such value to be undermined by the exhibits' lack of authenticity and their potential to confuse the jury, and, thus, excluded them. See *Ancheff* v. *Hartford Hospital*, supra, 260 Conn. 804 (relevant evidence may be excluded). Significant questions regarding the authenticity of the exhibits exist. Importantly, Brenes was never questioned concerning whether he had filled out and signed the 2008 and 2009 post office box applications. Moreover, the second pages of both applications were missing. Postmaster Bianca's testimony regarding the existence of and contrast between the two applications admittedly was based on assumption and speculation. The clerks who processed the applications did not testify, and there was no evidence to establish when the handwritten note was placed in Brenes' file. There was no other document offered by the defendant that linked Brenes, DK Management, LLC, and the defendant's full name.

Moreover, it is unclear how the exhibits all fit together, and their probative value regarding whether Brenes knew the defendant's last name prior to hiring him is low. The defendant attempted to piece multiple documents together like a complex jigsaw puzzle in order to establish that Brenes knew the defendant's last name in 2008. For the pieces of this puzzle to fit together as the defendant contends, however, too many assumptions, speculation, and logical leaps were required, none of which were supported by evidence actually offered or admitted at trial. Additionally, the defendant's confusing attempts to link these incomplete, unauthenticated documents together naturally affected the court's exercise of its discretion to exclude them. Just as "[t]he judge [has] a duty to comprehend what a witness says," the court in this case had a duty to comprehend the information contained in the exhibits to ensure that their admission would not confuse the jury. (Internal quotation marks omitted.) *Farrell* v. *St. Vincent's Hospital*, supra, 203 Conn. 563.

In sum, the court did not abuse its discretion by determining that even if the exhibits had some probative value, the documents remained inadmissible because of their lack of authenticity and their likelihood to confuse the jury. Accordingly, we conclude that the court did not improperly exclude them.

II

The defendant next claims that his due process right to a fair trial was violated by the state's failure to correct the false testimony of a state's witness that the state knew to be false. He specifically contends that the state knew that Brenes was aware of the defendant's last name prior to hiring him because the state knew about the exhibits relating to Brenes' post office box. Although the defendant concedes that he did not pre-

serve this claim properly at trial, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[12] For the reasons that follow, we find the record inadequate to review this claim.

The following additional facts are relevant to this claim. During the defendant's attempt to establish the admissibility of the exhibits concerning Brenes' post office box, the court asked the defendant when he had become aware of the exhibits. The defendant responded that he had secured some of the documents prior to Brenes' testimony but not all of them. The prosecutor disagreed, stating that he had obtained all of the exhibits at issue from a postal inspector and had given copies of the exhibits to the defendant prior to the start of trial. The court then asked the prosecutor: "[I]s it your representation that you were in possession of [the exhibits], and a question was asked [to Brenes] and [his] testimony contradicted what was in [the exhibit]?"[13] The prosecutor stated that he had questioned Brenes about the exhibits and that Brenes had told him that he had no connection to DK Management, LLC, and was not aware of the handwritten note in his file at the post office. The prosecutor also argued that he believed that Brenes testified truthfully and that the exhibits did not contradict his testimony because their authenticity never was established—specifically, Brenes never testified that he signed the post office box applications, the post office box applications were missing pages, and only the defendant signed the articles of organization.

The rules governing our evaluation of a claim that a prosecutor failed to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in *Brady* v. *Maryland*, 373 U.S. 83, 86–87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "In *Brady* . . . the United States Supreme Court held that the prosecution's failure to disclose a codefendant's statement that exculpated the defendant after the defendant had specifically requested that statement constituted a violation of the defendant's due process right under the fourteenth amendment. [T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Footnote omitted; internal quotation marks omitted.) *State* v. *Cohane*, 193 Conn. 474, 495, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984). "In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." *State* v. *Simms*, 201 Conn. 395, 405, 518 A.2d 35 (1986).

*Brady* and its progeny have been extended to include

circumstances in which the state knowingly uses perjured testimony to obtain a conviction. *United States* v. *Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). As our Supreme Court has stated, "the knowing presentation of false evidence by the state is incompatible with the rudimentary demands of justice. . . . Furthermore, due process is similarly offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . Regardless of the lack of intent to lie on the part of the witness . . . the prosecutor [must] apprise the court when he knows that his witness is giving testimony that is substantially misleading. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 560–61, 710 A.2d 1348 (1998).

With these legal principles in mind, we turn to whether this claim is reviewable under *Golding*. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable . . . ." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). Under the first prong of *Golding*, for the record to be adequate for review, the record must contain sufficient facts to establish that a violation of constitutional magnitude has occurred. *State* v. *Brunetti*, 279 Conn. 39, 55–56, 901 A.2d 1 (2006) ("we will not address an unpreserved constitutional claim [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred" [internal quotation marks omitted]), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). We conclude that the defendant's claim fails under the first prong of *Golding* because the record is inadequate for review on the ground that it contains no factual findings by the court as to whether Brenes testified falsely and, if he did, whether the state knew about it. Moreover, in the absence of any such factual findings by the trial court, the facts in the record are insufficient, unclear, and ambiguous as to whether a *Brady* violation has occurred.

On the basis of facts similar to those in the present case, our Supreme Court in *State* v. *Brunetti*, supra, 279 Conn. 42–43, declined to review a constitutional claim on the ground that the record was inadequate for review under the first prong of *Golding*. In *Brunetti*, the defendant's mother declined to sign a consent to search form that would allow the police to search the family home, but the defendant's father signed the consent to search form. Id., 42. At a hearing on a motion to suppress the evidence obtained during the search of the family home, the defendant argued only that the search was unlawful because the father's consent to the search had been coerced. Id., 48–49.

On appeal, the defendant claimed for the first time that there was no consent to search the home because his mother's refusal to sign the consent to search form, which had been admitted into evidence at the suppression hearing, established that she had refused to consent to the search. Id., 52–53. In declining to review the defendant's *Golding* claim, the court found that the record lacked a critical factual finding by the trial court regarding consent to search because the refusal to sign a consent to search form is not necessarily the equivalent to refusing consent to search. Id., 56. Our Supreme Court concluded that permitting *Golding* review of this unpreserved claim would be unfair to the state because the state was never put on notice that it was required to establish that the mother had consented to the search. Id., 59. Because the state was not granted the opportunity to present evidence that the mother consented to the search and the trial court did not make a finding as to whether she did so, our Supreme Court held that, pursuant to the first prong of *Golding*, the record was inadequate to review the defendant's unpreserved claim.

In the present case, because the defendant failed to raise this claim at trial, the record is silent with respect to two factual predicates necessary to establish his claim on appeal, namely, that Brenes testified falsely and the state knew or should have known that Brenes testified falsely. The defendant never sought any determination from the trial court that Brenes testified falsely and the state knew or should have known about it. Additionally, because the defendant did not pursue a *Brady* claim at trial, the state never was put on notice that it was required to present evidence regarding whether Brenes testified falsely and, if he did, whether the state knew his testimony was false. See *State* v. *Polanco*, 165 Conn. App. 563, 575–76,     A.3d (2016) (holding record inadequate for review under first prong of *Golding* if state not put on notice of claim made on appeal, and, thus, not given opportunity to put on evidence regarding claim because record did not contain adequate facts and state prejudiced by lack of notice). The defendant, nonetheless, contends that the record contains evidence—the excluded exhibits concerning Brenes' post office box—that supports his assertion, and he merely asks this court to draw a reasonable inference from that evidence. In essence, the defendant is asking this court to supplant the role of the jury or the trial court and find facts by weighing evidence and drawing inferences therefrom.

"We, as a reviewing court, [however] cannot find facts, nor, in the first instance, draw conclusions of facts from primary facts found . . . ." (Internal quotation marks omitted.) *State* v. *Kelly*, 95 Conn. App. 31, 37, 895 A.2d 801 (2006). Because it is the function of the trial court, not this court, to make factual findings;

see *State* v. *Satchwell*, supra, 244 Conn. 562; the defendant was required to seek a determination from the trial court of his fact-based claim that the state failed to correct testimony that it knew to be false. Because the defendant never did so, the record contains no findings to support his assertion. Because such findings are required to establish the defendant's *Brady* violation claim, we conclude that the defendant's claim fails under the first prong of *Golding*, and, thus, we decline to review it.

### III

The defendant's final claim on appeal is that because the evidence was insufficient to support his conviction of forgery in the second degree in violation of § 53a-139 (a) (3) and larceny in the third degree in violation of § 53a-124 (a) (2), the court improperly denied his motion for a judgment of acquittal. Concerning his conviction of forgery in the second degree, the defendant contends that there was insufficient evidence to establish that he intended to deceive Brenes and that he altered a state issued identification card. Concerning his conviction of larceny in the third degree, the defendant contends that there was insufficient evidence in the record to establish that a theft had occurred. We are not persuaded.

"It is well settled that a defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . [F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[O]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *VanDeusen*, 160 Conn. App. 815, 822–23, 126 A.3d 604, cert. denied, 320 Conn. 903, 127 A.3d 187 (2015). In viewing the evidence, "[i]f [inadmissible] evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of the rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value. . . . [T]herefore . . . appellate review of the sufficiency of the evidence . . . properly includes hearsay evidence even if such evidence was admitted despite a purportedly valid objection. Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Internal quotation marks omitted.) *State* v. *Eubanks*, 133 Conn. App. 105, 113–14, 33 A.3d 876, cert. denied, 304 Conn. 902, 37 A.3d 745 (2012).

A

The defendant claims that there was insufficient evidence to establish all the elements of forgery in the second degree in violation of § 53a-139 (a) (3), specifically, that he intended to deceive Brenes and that he altered an identification card. The state responds that the defendant relies upon evidence not admitted at trial to support his argument that he did not have the requisite intent, and that the evidence admitted at trial supports the jury's finding of intent and that he altered an identification card. We agree with the state.

The following additional facts and procedural history are relevant to resolve this claim. At the time that Brenes interviewed the defendant for the open sales associate position at National Credit Masters, the defendant provided Brenes with an identification card bearing the name "Keith David." Brenes made a photocopy of the identification card (photocopy) and then returned it to the defendant.

At trial, Brenes testified that prior to interviewing

the defendant, he did not know the defendant's last name and that after the interview, he believed the defendant's last name to be "David." Brenes further testified that he did not alter the identification card or the photocopy in any way. The state offered the photocopy into evidence. The photocopy was admitted as a full exhibit without objection by the defendant. The photocopy shows that the identification card was issued on April 17, 2002, and expired on July 17, 2006.

Also admitted into evidence as a full exhibit without objection was a printout of an electronic record (electronic record) from the Department of Motor Vehicles (department) that establishes that the defendant was issued an identification card on April 17, 2002, and that it expired on July 17, 2006, but the name on the identification card was "Keith D Chemlen." Mary Graziosa-Norton, an analyst with the document integrity unit at the department, testified that the photocopy and the electronic record were comparable except for the last name.

To convict the defendant of forgery in the second degree, the state had to prove beyond a reasonable doubt that: "*with intent to defraud, deceive or injure another*, he falsely [made], complete[d] or *alter*[*ed*] *a written instrument* . . . which is or purports to be, or which is calculated to become or represent if completed . . . (3) a written instrument officially issued or created by a public office, public servant or governmental instrumentality . . . ." (Emphasis added.) General Statutes § 53a-139 (a).

The defendant first argues that there is insufficient evidence to establish that he altered the identification card. Specifically, he contends that because the state offered only a photocopy of the allegedly altered identification card, rather than the actual identification card itself, the record lacks sufficient evidence to establish that he altered the identification card. He further contends that Brenes altered the photocopy. The state responds that because the defendant did not object to the admission of the photocopy, it was admitted into evidence as a full exhibit and could be used for the substantive purpose of establishing that the defendant altered the identification card. We agree with the state.

As defined by General Statutes § 53a-137 (6), "[a] person 'falsely alters' a written instrument when (A) such person, without the authority of any person entitled to grant it, changes a written instrument, whether it be in complete or incomplete form, by means of erasure, obliteration, deletion, insertion of new matter or transposition of matter or in any other manner, so that such instrument in its thus altered form appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer . . . ."

In determining the sufficiency of the evidence, we may consider no more and no less than the evidence admitted at trial. If "evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of the rational persuasive power it may have." (Internal quotation marks omitted.) *State* v. *Eubanks*, supra, 133 Conn. App. 113. In the present case, the defendant did not object to the admission of the photocopy into evidence, nor did he object to the admission of the electronic record. Both documents were admitted without limitation and the jury weighed them as it deemed appropriate.[14] The jury also reasonably may have credited Brenes' testimony that he did not alter the identification card or the photocopy. The weight to afford evidence is within the exclusive purview of the trier of fact, and we must defer to the jury's credibility assessment. See *State* v. *Smith*, supra, 46 Conn. App. 296–97. On the basis of the testimony and evidence admitted into evidence at trial, the jury reasonably could have concluded that (1) the photocopy was a true and correct original of the identification card presented to Brenes by the defendant; (2) the identification card presented to Brenes had been altered because it had a different last name than the identification card issued by the department; and (3) the defendant had the identification card in his possession, thereby giving him the opportunity and motive to alter it. Thus, the jury further reasonably could have concluded that the defendant altered the identification card.

The defendant next argues that the evidence in the record is insufficient to establish that he had the intent to defraud or deceive Brenes. Specifically, the defendant contends that Brenes knew his last name prior to interviewing him, and, thus, Brenes could not be deceived by the altered license. The state responds that no evidence was admitted at trial to support the defendant's contention, and, even if Brenes knew the defendant's last name when he interviewed him, Brenes' knowledge of that fact is immaterial to the defendant's intent. We agree with the state.

"It is well settled . . . that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide. . . . Intent may be inferred from circumstantial evidence such as the events leading to and immediately following the incident, and the jury may infer that the defendant intended the natural consequences of his

actions." (Citation omitted; internal quotation marks omitted.) *State* v. *Dickman*, supra, 119 Conn. App. 588.

"It is important to note that the specific intent element of the forgery statute is satisfied by an intent to defraud as well as an intent to deceive. The ordinary meaning of the phrase 'to deceive' is 'to cause to believe the false. . . . Deceive indicates an inculcating of one so that he takes the false as true, the unreal as existent, the spurious as genuine . . . . In contrast, 'to defraud' means 'to take or withhold from (one) some possession, right, or interest by calculated misstatement or perversion of truth, trickery, or other deception.' " (Citations omitted.) *State* v. *Yurch*, 37 Conn. App. 72, 80–81, 654 A.2d 1246, appeal dismissed, 235 Conn. 469, 667 A.2d 797 (1995).

The defendant's argument fails for two reasons. First, § 53a-139, like General Statutes § 53a-140, does not address the state of mind of the victim of forgery in the second degree. In other words, whether the victim was in fact deceived is not an element of the offense. *State* v. *Dickman*, supra, 119 Conn. App. 589. "The statute sets forth the elements of the crime, including the intent of the accused. Whether an accused, in this case the defendant, was successful in an attempt to deceive is not the issue." Id. Thus, whether Brenes knew the defendant's last name is immaterial to the defendant's intent. The defendant argues that the jury reasonably could have inferred that because Brenes knew his last name at the time that Brenes hired him, the defendant could not have intended to deceive Brenes. The jury, however, reasonably could have inferred from the evidence in the record that the defendant would not have presented Brenes with an altered identification card if he thought that Brenes knew his last name. The jury reasonably could have inferred that because the defendant provided Brenes with an altered identification card with a fake last name, he intended to deceive Brenes.

Second, the evidence that the defendant relies upon to establish that he did not intend to deceive Brenes—the exhibits concerning Brenes' post office box—were not admitted into evidence. In evaluating a sufficiency of the evidence claim, we can review no more and no less evidence than that which was admitted at trial. See *State* v. *VanDeusen*, supra, 160 Conn. App. 822. Other than the excluded exhibits concerning Brenes' post office box, the defendant refers us to no evidence that was admitted at trial that may establish that he did not intend to deceive Brenes because he believed that Brenes knew his last name at the time he interviewed him. Accordingly, the jury reasonably concluded that the defendant intended to deceive Brenes.

In sum, the evidence in the record is sufficient to support the jury's reasonable conclusion that the defendant altered the identification card and intended to

deceive Brenes. Accordingly, we conclude that, viewing the evidence in the light most favorable to sustaining the verdict, the jury reasonably concluded that the cumulative force of the evidence established the defendant's guilt of forgery in the second degree in violation of § 53a-139 (a) (3) beyond a reasonable doubt.

B

The defendant next claims that the evidence was insufficient to establish all the elements of larceny in the third degree in violation of § 53a-124 (a) (2). Specifically, he argues that there is no evidence to support the jury's finding that he stole money from Damien Dawes, Edwin Garcia, or David Brown.[15] He contends that both Dawes and Edwin Garcia paid a fee to National Credit Masters and that their credit was fixed by National Credit Masters. As for Brown, the defendant contends that Brown paid the fee to National Credit Masters, and subsequently requested that his money be returned prior to the defendant's having an opportunity to work on the case. Although not explicitly stated, the defendant's argument on appeal encompasses the argument that he made at trial in support of his motion for a judgment of acquittal. At trial, he argued that because he was an employee of National Credit Masters at the time that he accepted the money from the clients, the money that he allegedly stole was the property of National Credit Masters, not the clients, and, thus, he did not steal from Dawes, Edwin Garcia, or Brown.

The jury reasonably could have found the following additional facts. Dawes paid the defendant $220 in cash in exchange for the defendant's promise to remove negative information on his wife's credit report in order for Dawes and his wife to qualify for a mortgage to buy a house. The defendant had told Dawes that it could take sixty to ninety days to repair his wife's credit score. After sixty days, Dawes contacted the defendant and was told that his wife's credit had been repaired. Dawes and his wife proceeded to apply for a mortgage but did not qualify because nothing had been done to fix his wife's credit score and it remained too low to qualify. Because Dawes and his wife were not able to get a mortgage in time, they could not close on the property that they had contracted to purchase. Dawes met with Brenes to discuss the defendant's actions, and Brenes offered to repair his wife's credit free of charge. Brenes did not receive the $220 fee that Dawes paid to the defendant.

The defendant had told Brown that he would repair Brown's credit and would negotiate settlements on specific debts in exchange for a fee of $375. Brown paid the defendant the $375 fee through PayPal to an account for Sky Agency, which was associated with an e-mail address of kchemlen@gmail.com. The defendant informed Brown that it could be a couple of weeks to a couple of months before he would see results. The

defendant later told Brown that he had reduced through negotiations a debt that Brown owed to Bolton Veterinary Clinic from $575 to $82, and instructed Brown to pay the defendant the $82 through PayPal to the Sky Agency account in order that the defendant could pay Bolton Veterinary Clinic. Brown paid the defendant $82 through PayPal. The defendant similarly told Brown that he had settled a debt owed to AT&T for $37, and instructed Brown to send him the money through PayPal, which Brown did.

Brown subsequently received a telephone call from Brenes, notifying him that the defendant had accepted money from clients without doing the work or turning over the payments to National Credit Masters. After this telephone call concluded, Brown called the defendant, but there was no answer. Brown then contacted Bolton Veterinary Clinic, which informed him that his debt never had been settled, nor paid. Brown proceeded to obtain a copy of his credit report and discovered that none of his debts had been removed. Brown contacted PayPal and requested, and received, a refund of all the funds that he had paid to the defendant. Brenes did not receive the funds that Brown paid to the defendant.

Edwin Garcia paid the defendant $275 in cash in exchange for the defendant to repair his credit, particularly to dispute three negative instances listed on his credit report. After paying the defendant, Edwin Garcia waited for an update from the defendant. When Edwin Garcia did not hear from the defendant, he left voicemail messages for him. Edwin Garcia obtained a copy of his credit report and discovered that his credit had not been repaired. Edwin Garcia then contacted Brenes. Brenes had not received the $275 fee that Edwin Garcia paid to the defendant but offered to repair Edwin Garcia's credit without charge.

"A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds two thousand dollars . . . ." General Statutes § 53a-124 (a). Pursuant to § 53a-119: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." Larceny includes, but is not limited to, obtaining property by false promises. "A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct or does not believe that the third person intends to engage in such conduct. In any prosecution for larceny based upon a false promise, the defendant's intention or belief that the promise would not be performed may not be established by or inferred from

the fact alone that such promise was not performed." General Statutes § 53a-119 (3).

"Our courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Friend*, 159 Conn. App. 285, 294, 122 A.3d 740, cert. denied, 319 Conn. 954, 125 A.3d 533 (2015). "An 'owner' means any person who has a right to possession superior to that of a taker, obtainer or withholder." General Statutes § 53a-118 (a) (5).

The defendant does not dispute whether he had the requisite intent to deprive an owner of property. Instead, he disputes only whether a theft in fact occurred because, according to his claim, the alleged victims received in kind services in exchange for their payment of funds. Specifically, he contends that in all three instances, a fee was paid to National Credit Masters and that National Credit Masters repaired each client's credit report. Concerning Dawes and Edwin Garcia, he contends that they paid National Credit Masters a fee to fix their credit scores and National Credit Masters fixed their credit scores, and, thus, no theft occurred. Concerning Brown, he contends that Brown paid National Credit Masters a fee to fix his credit score but because he was not willing to wait a few months for the defendant to do the work, he requested and received a refund of this fee, and, thus, no theft occurred.

The evidence in the record supports the jury's finding that the defendant engaged in a scheme to defraud clients by promising, although never intending to do so, that he would repair their credit scores and settle debts in exchange for a fee. From the evidence in the record, the jury reasonably could have found that the defendant lied to Dawes, Edwin Garcia, and Brown about repairing their credit scores for the purpose of wrongfully taking funds from them. The jury further reasonably could have found that the defendant did not give these funds over to National Credit Masters, but kept these funds for himself, and, thus, intended to deprive Dawes, Edwin Garcia, and Brown of their funds permanently without their consent. Although Dawes, Edwin Garcia, and Brown paid the fees to the defendant with the expectation that the fees would be paid to National Credit Masters, the defendant's employer did not receive these fees.

To find that the defendant did not steal their money because Brenes offered to repair their credit without charge would reward the defendant for Brenes' attempts to right the wrong that the defendant caused. Additionally, the refund that Brown received from PayPal does not negate the fact that the defendant stole

money from him. If we accepted the defendant's logic, any time a defendant committed credit card fraud and the victim received a refund from his or her bank, the defendant would be alleviated of criminal responsibility.

To the extent that the defendant's argument also implicitly includes the argument that he made at trial in support for his motion for a judgment of acquittal— that the owner of the stolen funds was National Credit Masters and not the clients—we similarly are not persuaded. According to the defendant, once the clients handed the money over to the defendant, National Credit Masters owned it and, thus, the defendant stole from his employer, not Dawes, Edwin Garcia, and Brown. This logic, however, would allow the defendant to benefit from his false promises and lies. The state must establish only that the defendant wrongfully caused the transfer of the property from the owner to the defendant. See *State* v. *Friend*, supra, 159 Conn. App. 294. In this case, the defendant did this by falsely representing to Dawes, Edwin Garcia, and Brown that he would fix their credit scores in exchange for certain fees. The defendant conducted his scheme out of his employer's office, adding apparent legitimacy to it. Using his employer, however, as a means to deceive people to pay money does not lessen the fact that he stole money from Dawes, Edwin Garcia, and Brown. Although National Credit Masters has been victimized as well by the defendant's actions, it was Dawes, Edwin Garcia, and Brown from whom the defendant stole money.

In sum, after reviewing the record before us, the jury reasonably found that the defendant wrongfully took property from Dawes, Edwin Garcia, and Brown without their consent. Accordingly, in viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably concluded that the cumulative force of the evidence established the defendant's guilt of larceny in the third degree in violation of § 53a-124 (a) (2) beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-139 (a) provides in relevant part: "A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or *alters a written instrument* or issues *or possesses any written instrument which he knows to be forged,* which is or purports to be, or which is calculated to become or represent if completed . . . (3) a written instrument officially issued or created by a public office, public servant or governmental instrumentality . . . ." (Emphasis added.)

[2] General Statutes § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds two thousand dollars . . . ."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[3] On the basis of double jeopardy, the court vacated the verdict on the second count of forgery in the second degree, which alleged that the defendant possessed a state issued identification card that he knew to be forged.

[4] The trial court stated that it was confused by the presentation of the exhibits.

[5] Defense exhibit G, which is identical to defense exhibit B, is a single page document that has two different post office box applications on it. Each application is approximately one-half page in length. Because the two applications have different dates and are separate applications, the court had the document divided so each application was its own exhibit. The January 29, 2008 application became defense exhibit J, and the February 13, 2009 application became defense exhibit K.

[6] We note that the defendant's appellate brief does not address specifically which exhibits were excluded improperly, but rather he contends more generally that he was prevented from impeaching Brenes. Although the defendant's brief is unclear, we assume that this claim is directed at each of the exhibits that the defendant offered concerning Brenes' post office box, and address each in turn.

[7] Section 6-10 of the Connecticut Code of Evidence provides in relevant part: "(a) Prior inconsistent statements generally. The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness. . . .

"(c) Extrinsic evidence of prior inconsistent statement of witness. If a prior inconsistent statement made by a witness is shown to or if the contents of the statement are disclosed to the witness at the time the witness testifies, and if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, except in the discretion of the court. If a prior inconsistent statement made by a witness is not shown to or if the contents of the statement are not disclosed to the witness at the time the witness testifies, extrinsic evidence of the statement is inadmissible, except in the discretion of the court."

[8] The court apparently found that the exhibits related to a noncollateral matter because if it had concluded that the exhibits related to a collateral matter, it would have likely excluded them on that basis. *State* v. *Diaz*, supra, 237 Conn. 548.

[9] Section 4-1 of the Connecticut Code of Evidence provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceedings more probable or less probable than it would be without the evidence."

[10] Section 4-3 of the Connecticut Code of Evidence provides in relevant part: "Relevant evidence may be excluded if its probative value is outweighed by . . . confusion of the issues . . . ."

[11] Section 9-1 of the Connecticut Code of Evidence provides in relevant part: "(a) Requirement of authentication. The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be. . . ."

[12] "Under *Golding* review, as modified in *In re Yasiel R.*, supra, 317 Conn. 781, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *D'Amato*, 163 Conn. App. 536, 543 n.9,      A.3d      , cert. denied, 321 Conn. 909,      A.3d      (2016).

[13] Although the court questioned the prosecutor about the possibility that he knew that Brenes testified falsely, this colloquy did not preserve the defendant's *Brady* claim on appeal. The defendant did not pursue the court's inquiry further, raise the issue of a potential *Brady* violation, or cite to any relevant legal authority concerning a *Brady* violation during trial. Furthermore, the issue was never raised postjudgment, and, therefore, the court never made a finding as to whether Brenes lied and whether the state knew his testimony was false.

[14] We note that if we required the state to offer into evidence the altered identification card in order to prove forgery in the second degree, we would reward defendants who destroy or hide evidence.

[15] The defendant does not challenge on appeal the sufficiency of the evi-

dence in support of the jury's finding that he stole money from Michelle Garcia or Craig Kozloski. From the evidence presented at trial, the jury reasonably could have found that the defendant told Michelle Garcia that he had negotiated one of her debts with a creditor and that the debt would be removed from her credit report if she paid him $1141.50 in cash so that he could pay the creditor. Michelle Garcia gave the defendant $1142 in cash, which neither the creditor nor National Credit Masters received. Not only did the creditor never receive the money, but the defendant never negotiated the debt because the creditor removed the debt when it discovered that the social security number associated with the debt did not match Michelle Garcia's social security number.

The jury also reasonably could have found that Kozloski paid the defendant $300 in cash to remove a bankruptcy and other negative information from his credit report. The defendant sent e-mails from a personal e-mail account to Kozloski with fake credit reports that stated that his credit score was improving. Once the defendant reported that all the negative information was removed from the credit report, Kozloski applied for a credit card and was denied because his credit score had remained the same, and the negative information and bankruptcy were listed still on his credit report. National Credit Masters did not receive the $300 that Kozloski paid to the defendant.

———————————————————