ANTHONY J. FRANCOLINE *v.* LINDA KLATT ET AL.
(9659)

DUPONT, C. J., O'CONNELL and FOTI, Js.

Argued September 23—decision released December 10, 1991

*Robert J. Reeve,* with whom, on the brief, was *Edward F. Scully,* for the appellant (named defendant).

*Ann M. Siczewicz,* for the appellee (plaintiff).

FOTI, J. The named defendant[1] appeals from the judgment rendered against her on her counterclaim alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes §§ 42-110a through 42-110q.[2] The defendant filed the counterclaim in response to the plaintiff's action for specific performance of an alleged contract for the sale of certain of

---

[1] While there were two defendants named in the complaint, this appeal is taken by Linda Klatt only. The second defendant is George R. Recck. In this opinion, we will refer to Klatt as the defendant.

[2] The defendant's second amended counterclaim contains five counts. Only the second count is the subject of this appeal.

the defendant's real property. The defendant claims that the trial court applied an incorrect legal standard and that it failed to conclude from the facts found that a violation of CUTPA had been established as a matter of law. The defendant also claims that the court ruled incorrectly on certain evidentiary matters.[3] We reverse the judgment.

The trial court found the following facts. The defendant owns a parcel of commercially zoned land in the town of Avon. On the property, which is known as 37 West Main Street, there is a freestanding garage and an old house that was used for offices. The plaintiff owns the property that abuts the defendant's property to the west and south, and George Recck owns the adjacent real estate to the east of the defendant's land. All three properties front on West Main Street.

The defendant purchased 37 West Main Street in 1982. She is an attorney admitted to the practice of law in this state and had conducted her law practice from that location until 1986, when she relocated to South Carolina. Both the plaintiff and Recck are in the real estate development business. The defendant has been renting the garage at 37 West Main Street to the plaintiff for the last five to six years. In either 1983 or 1984, the plaintiff approached the defendant and indicated that he was interested in either purchasing her property or entering into a joint venture to develop it. Nothing came from these discussions. In September, 1988, the plaintiff contacted the defendant to see if she was interested in selling 37 West Main Street to him. After a number of telephone calls, they orally agreed on a purchase price of $400,000.

By letter dated October 18, 1988, the plaintiff sent his version of the parties' telephone agreement and

[3] In view of the conclusion reached, we find it unnecessary to address this claim.

requested that she sign the letter. The defendant made two changes to the proposal and initialed both changes. The first change was an addition stating "Buyer to pay Connecticut Transfer Taxes." The second change substituted October for November as the time of the expiration of the leases of the buildings on the premises. The defendant then signed the letter as she had changed it and returned it to the plaintiff with an undated cover letter which the plaintiff received on November 3, 1988. He took no further action on the letter itself. The proposed agreement was by its terms subject to "a mutually agreeable Bond for Deed." Ten percent of the purchase price of $400,000 (i.e., $40,000) was payable at the signing of a mutually agreeable bond for deed by November 11, 1989.

The plaintiff began discussing the development of the referenced property with one of his tenants, who claimed to need more space than the plaintiff had at his property to the west of the subject property. On January 7, 1989, the plaintiff's attorneys sent the defendant an unsigned "Purchase and Sales Agreement" for her review, enclosed with a cover letter. Shortly thereafter, the plaintiff telephoned the defendant and the two discussed the possibility of a tax free exchange of realty at no cost to the plaintiff.

On January 25, 1989, the defendant returned the "Purchase Agreement" which she had amended in four respects. First, she deleted a clause. Second, she added a sentence making the purchaser liable for transfer taxes and fees. Third, she removed a paragraph entitled "Purchaser's Default" and inserted a new paragraph. Last, she added a paragraph marked "Tax Free Exchange." In addition, she completed a "Rent Roll" and a "Tenant Collateral Agreements" as requested by the plaintiff's attorney. She signed the changed agreement, had her signature witnessed and notarized, and sent the changed agreement to the plaintiff with

a cover letter dated January 25, 1989. The plaintiff received this correspondence on January 30, 1989.

The parties spoke on the telephone within a few days and discussed the changes that the defendant had made. They also discussed a sewer lien which was not mentioned in the agreement. Finally, they discussed the tax free exchange by which the plaintiff would purchase some property in South Carolina and swap it for the subject property.

On February 8, 1989, the plaintiff sent the defendant the "Purchase and Sales Agreement" signed by him, which had been witnessed and notarized. The plaintiff had initialed the defendant's changes, crossed out one full paragraph, inserted another, and added a clause to another section. The defendant did not initial these changes, did not sign the document as changed by the plaintiff and did not return the document to the plaintiff. In late February, 1989, the plaintiff attempted to call the defendant but was unable to reach her. He left a message for her to call him. On February 27, 1989, the defendant returned the plaintiff's call. He was not there. She left a message that she did not agree with his changes to the agreement and she instructed him to call her. The two did not talk further until the middle of March, when the plaintiff discovered that the defendant planned to sell the real estate to Recck and not to the plaintiff.

In mid-February, 1989, Recck had telephoned the defendant in regard to the sale of the realty in question. He had a bond for deed to purchase the realty to the east of the subject property which he purchased shortly thereafter. The defendant told Recck that the property was for sale at $425,000. Recck told the defendant that he would get back to her. After he had an engineer do a sketch, he called the defendant and accepted her offer. He then called his attorney to draft

a bond for deed which he signed before a notary, his attorney, and witnesses. He then sent this document to the defendant on February 15, 1989. The bond for deed called for a closing on or before April 15, 1989. The two parties then executed a "Purchase and Sales Agreement" which provided that the closing would take place on April 15, 1989. To date, no closing has occurred.

The plaintiff had been told by his attorney to get the defendant's signature on his changes to the agreement, and the plaintiff had sent the agreement to the defendant for her signature. The plaintiff, however, signed the altered agreement on the same pages as the defendant had signed earlier, prior to the changes. On the same date, he mailed the agreement to the defendant for her signature. In other words, the agreement now bearing the defendant's signature had been changed after she signed it.

On March 16, 1989, the plaintiff learned from one of the defendant's tenants in the building on the subject premises that the defendant had agreed to sell the realty to Recck. On March 21, 1989, the plaintiff recorded the altered purchase and sales agreement on the town of Avon land records. On April 7, 1989, he commenced an action for, inter alia, specific performance of the alleged contract against the defendant, and recorded a lis pendens on the land records. The defendant demanded that the plaintiff remove the "agreement" from the land records and discharge the lis pendens. The plaintiff refused to do so.

In regard to the defendant's CUTPA claim against the plaintiff, the trial court concluded that the claim lacked merit because "[t]he plaintiff thought and had concluded, after discussing the matter with his attorney, that he had an agreement with the defendant Klatt to buy the property. Under the circumstances, this

court does not believe that the plaintiff's conduct offends public policy or is immoral or unscrupulous."

The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce,[4] and whether a practice is unfair depends upon the finding of a violation of an identifiable public policy. *Daddona* v. *Liberty Mobile Home Sales, Inc.,* 209 Conn. 243, 257, 550 A.2d 1061 (1988). "[T]he subjective good faith of one who has in fact performed an unfair or deceptive act is not a defense to a CUTPA violation . . . ." *Eamiello* v. *Liberty Mobile Home Sales, Inc.,* 208 Conn. 620, 654, 546 A.2d 805 (1988), appeal dismissed, 489 U.S. 1002, 109 S. Ct. 1104, 103 L. Ed. 2d 169 (1989). Connecticut courts, in adopting the federal "cigarette rule,"[5] have considered the following criteria to determine whether certain practices violate CUTPA: " '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " *FTC* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972); *McLaughlin Ford, Inc.* v. *Ford Motor Co.,* 192 Conn. 558, 567–68, 473 A.2d 1185 (1984); *Conaway* v. *Prestia,* 191 Conn. 484, 492–93, 464 A.2d 847 (1983). In this case,

---

[4] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." By his pleadings, the plaintiff admits that he is a real estate developer.

[5] For the derivation of this name, see *Siudyla* v. *ChemExec Relocation Systems Inc.,* 23 Conn. App. 180, 186 n.2, 579 A.2d 578 (1990).

the trial court considered the correct legal standard in determining whether the plaintiff was liable under CUTPA.

The trial court found facts that are not disputed on appeal. The trial court found that the plaintiff had made changes to a document containing the defendant's signature that purported to be a purchase and sale agreement between the parties. The plaintiff then recorded it on the land records. The court also found that the defendant never agreed to the amendments and that the plaintiff had altered and signed it himself on February 8, 1989, the same day on which he proposed to the defendant that she accept his suggested modification. The court found that on March 21, 1989, five days after learning that the defendant had an agreement to sell the realty to Recck, the plaintiff recorded the instrument in question, which he had knowingly altered after the defendant's signature. The court concluded after making these findings that the plaintiff's conduct did not offend public policy, as a result of the plaintiff's subjective state of mind.

On review, we will not invade the factfinding province of the trial court or disturb its legal conclusions when they are sufficiently supported by the evidence before it. *Bowman* v. *1477 Central Avenue Apartments, Inc.,* 203 Conn. 246, 256–57, 524 A.2d 610 (1987). We also recognize that the weight and credibility to be accorded witnesses is totally within the purview of the trier of fact. *Temple* v. *Meyer,* 208 Conn. 404, 407, 544 A.2d 629 (1988). "A matter of fact is a question of truth to be decided upon conflicting evidence. Ballentine's Law Dictionary (3d Ed. 1969)." *Sweet* v. *Sweet,* 190 Conn. 657, 663, 462 A.2d 1031 (1983). While the finding of what practice or act was committed in CUTPA cases is an issue of fact; *Edart Truck Rental Corporation* v. *B. Swirsky & Co.,* 23 Conn. App. 137, 145, 579

A.2d 133 (1990); *DeMotses* v. *Leonard Schwartz Nissan, Inc.,* 22 Conn. App. 464, 466, 578 A.2d 144 (1990); there may be situations where the facts found are so egregious as to require a conclusion, as a matter of law, that there has been a violation of a public policy. Such circumstances may encompass acts that violate a criminal statute, or, as here, a flagrant abuse of the purposes of recordation.

Recording places on file, in a public place, the written evidence of an agreement, which may affect an interest in land. Our statutes allow a contract for the conveyance of land to be recorded so that notice to the world is given of a claimed equitable interest. General Statutes § 47-17. "It has always been the policy of our law that the land records should be the *authentic* oracle of title on which [anyone] might safely rely." (Emphasis added.) *Safford* v. *McNeil,* 102 Conn. 684, 687, 129 A. 721 (1925). " 'The whole system [of recordation] would become of no value if [one] could not rely upon the records as he finds them.' " *Wheeler* v. *Young,* 76 Conn. 44, 49, 55 A. 670 (1903). The recording of an altered document contravenes the public policy of this state.

Violation of an identifiable public policy alone may be insufficient under certain circumstances to support a CUTPA violation. *A-G Foods Inc.* v. *Pepperidge Farm, Inc.,* 216 Conn. 200, 217, 579 A.2d 69 (1990). Whether in this case the defendant has in fact proven a substantial injury in addition to the violation of public policy, and whether such is required must be determined by the trial court.

The judgment on the named defendant's counterclaim is reversed and the matter is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.