******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SEELEY, J., dissenting. I respectfully disagree with the conclusions reached by the majority that **(1)** the trial court's "finding of duress" is clearly erroneous, **(2)** the trial court required the plaintiff, the Housing Authority of the town of East Hartford, "to submit direct evidence to establish a serious nuisance claim" against the defendant, Harriett Williams, and **(3)** the trial court's findings that there existed " 'no evidence' regarding the defendant's alleged drug activity in the unit" and " 'no evidence' that the defendant had engaged in or allowed others to engage in violence in her unit" are clearly erroneous. For the reasons that follow, I reach a contrary conclusion and, therefore, would affirm the judgment of the trial court. Accordingly, I respectfully dissent.

The following facts and procedural history are relevant to my analysis and why I disagree with the majority. The plaintiff, which owns a low-income housing development in East Hartford **(development)** and had leased a unit in the development to the defendant, commenced this summary process action against the defendant[1] alleging, in count one, that the defendant had violated various provisions of the lease by "fail[ing] to act and cause her guests to act in a manner that would not disturb her neighbors' quiet enjoyment," by "engag[ing] in (or allow[ing] others to engage in) physical violence in her unit," and by "using (or allowing others to use) her unit for the illegal sale of drugs." In count two, the plaintiff alleged that the defendant committed a nuisance in violation of General Statutes § 47a-32 in two ways, namely, by "substantially interfer[ing] with the comfort and safety of other tenants when, on or about December 7, 2023, [she] allowed **(**and/or directed**)** one of her guests in her unit to assault another tenant by punching her and then allowed another of her guests to cut her and drag that same individual through the hallway of her building by her hair," and/ or by allowing her unit to be used for the illegal sale of

---

[1] As indicated in the majority opinion, prior to commencing this action, the plaintiff sent the defendant a pretermination notice and served the defendant with a notice to quit, but the defendant did not quit possession of the premises.

drugs. Count three alleged that the defendant committed a serious nuisance in violation of General Statutes § 47a-15 by "allowing the subject premises to be used for the illegal sale of drugs" and when, on December 7, 2023, "she threatened another tenant with bodily harm and directed and/or allowed one of her guests in her unit to assault that tenant and inflict bodily harm by punching her and then allowed another of her guests to cut her and drag that same individual through the hallway of her building by her hair." Finally, count four alleged that the defendant violated General Statutes § 47a-11 as a result of the December 7, 2023 incident and by creating a nuisance through the illegal sale of drugs from her unit and by failing to conduct herself or requiring her guests to conduct themselves in a manner that does not create a nuisance.

On April 19, 2024, the self-represented defendant filed an answer and special defenses, in which she denied involvement in criminal activity. Specifically, the defendant asserted: "Everything that was said about me was by a third part[y] and signed by several people in order to keep their apartment. I have proof [of] this as . . . each person gave me permission to record them and [I] verified this is what happened [at] housing."

The case was tried to the court over the course of two days on July 3 and August 9, 2024. At trial, the plaintiff presented testimony from several witnesses. First, Lynn Naughton, a compliance director for the plaintiff, testified that she was familiar with the defendant "from numerous complaints from other tenants and also documented videos and issues that [have] occurred in [the] building . . . ." When asked what conduct of the defendant preceded the pretermination notice, Naughton explained that "[t]here [had] been excessive amounts of disturbances in [regard] to the neighbors, solicitation of illegal activity," and lease violations stemming from tenants being harmed from the defendant's unit. Naughton testified that she knew an individual by the

name of Lucius Mathis, a now deceased tenant against whom an eviction proceeding had been commenced the prior year for his alleged involvement in a knife fight with another individual in the defendant's building that extended from outside of the defendant's unit to the elevators and to other floors, resulting in that other individual having his lungs punctured. In particular, she testified that the fight between Mathis and the other individual began after the two exited the defendant's unit. The building in which the fight took place and the defendant resides has a camera system that captured the fight. Video footage from those cameras was admitted into evidence and viewed by the court.[2] In addition to the fight, it shows the defendant cleaning up blood on the floor outside of her unit.

Naughton testified further that, after an eviction proceeding was commenced against Mathis, Mathis reached out to her to speak to her in an effort to remain in the

[2]With respect to that video footage evidence, the court stated in its memorandum of decision: "The court reviewed video evidence that displayed two incidents of violence. The first incident of violence recorded took place on December 7, 2023, when a tenant residing in the premises was dragged out of the defendant's unit by another tenant. The assault continued in the hallway, involving punching and kicking. The evidence established that both tenants resided in the building in their own separate units and were bound to separate lease agreements. The tenants involved in this altercation were subsequently evicted from the premises. There was also video evidence submitted of another violent altercation that took place after another tenant and another individual left the defendant's unit. The violence took place in the hallway of the premises and ultimately spilled into the elevator, where the tenant involved stabbed the other individual with a knife.

"The court further reviewed video evidence where the same tenant involved in the stabbing left the home of the defendant and was then found (hours later) in the unit he was residing in, unresponsive as a result of a drug related overdose. Lastly, the court reviewed security camera footage that displayed heavy foot traffic to and from the defendant's unit on multiple dates. Multiple individuals, some of whom were identified as tenants, would visit the defendant's unit for very brief periods of time at all hours of the day and night. Some visits would only last minutes and the visitors would vary, with some individuals making multiple visits."

building.[3] According to Naughton, Mathis told her that the reason for the fight was "a drug deal that went bad" and that drugs were being sold out of the defendant's unit. Naughton explained that Mathis eventually was evicted but he returned to the building because he had no place to stay, as he befriended another tenant, Julia Rivera, and moved into her unit. In December, 2023, Mathis died of an overdose of fentanyl while in Rivera's unit. Naughton also testified regarding the video of a tenant, Rivera, pulling another tenant, Angela Brown, out of the defendant's unit by her hair. Rivera had provided a statement to the plaintiff to the effect that she had been instructed by the defendant to do that to Brown. After the court admitted the video of that incident into evidence without objection from the self-represented defendant, the court stated to the plaintiff's counsel: "And counsel, I . . . would just like for your client to just be cautious of third-party statements being brought into court without the witness being present." The plaintiff's counsel responded that he would do his best.

After that exchange, Naughton was questioned regarding a document that was placed before her dated March 22, 2024, which set forth a conversation that had taken place between Naughton and Brown in which Brown admitted to buying illegal drugs from the defendant out of the defendant's unit. The document was admitted into evidence as exhibit 7 without objection by the defendant.

During cross-examination, Naughton testified that "all the tenants that [were] facing eviction, once they're facing eviction, they want to stay. And, unfortunately for [the defendant], they would talk about the things that [the defendant] did not expect them to tell the housing authority. . . . So, what they did was they actually put it in writing hoping that we would say, okay, you know what, you can stay based on the information." After the defendant finished cross-examining Naughton, the

[3] Specifically, Naughton testified that Mathis "called me up and he wanted to speak to me in regard to is there any possible way he can stay in the building because he has no place to go."

plaintiff's counsel stated to the court: "Given that the defendant asked my client whether any other tenants have complained about her, I think that's opened the door." He then questioned Naughton on redirect whether any other tenants have complained about the defendant, to which Naughton responded, "[y]es," and named several individuals, including Frances Brewster, after which the plaintiff's counsel marked for identification a handwritten note purportedly from Brewster and questioned Naughton about the note. The note consists of a single, handwritten sentence stating that Brewster received drugs in exchange for money from the defendant in the defendant's unit. Naughton explained that Brewster provided the note because she was going to be evicted from the property for her conduct in doing "illegal activities," but that the eviction was never commenced because Brewster's family moved her out of the building. That note was admitted into evidence.[4]

The plaintiff's counsel next offered into evidence a handwritten note purportedly from Rivera, who had been evicted from the development, in which Rivera states in a few sentences that the defendant sells drugs from the bedroom of her unit. When the court asked the defendant if she had an objection, a lengthy exchange took place in which the defendant expressed confusion about raising an objection. During that exchange, the court asked the defendant a number of times whether she had an evidentiary or legal reason why she believed that the court should not review the evidence, to which the defendant expressed disagreement with the contents of the note and replied: "The reason is because the day that this lady signed this paper, she came to my house and she said that [Naughton] had wanted to see her in her office and say that she was getting evicted. And so

[4] Prior to the admission of the note into evidence, the court asked the defendant if she had any objection to the court reviewing the document, to which the defendant replied by asking: "If—by me saying yes or no, do I have an opportunity to speak on these?" The court replied, "[y]es," and the defendant responded: "Okay, thank you. That's all I wanted. Yes, you can present it." After that exchange, the court admitted the note into evidence.

. . . her reason was supposed to be getting evicted . . . because she was having problems going in and out of [people's] house[s], apartment[s], the whole building, everybody's building, [for] which [Naughton] had [given] the lady numerous warnings . . . ." The court considered the defendant's response as an objection. The plaintiff's counsel replied that the objection was not based on an evidentiary ground, and the court agreed, overruling the defendant's objection and admitting the document into evidence. In doing so, the court stated: "I'm going to allow the document to come in as a full exhibit; however, I'm going to give it the weight that it deserves in light of your objection."[5] Subsequently, Naughton testified to the contents of the note. Naughton testified that Rivera gave her that note because she "did not want to get evicted and asked after there was the altercation that occurred in [regard] to numerous altercations of bullying, of fighting, and other issues from this unit and also from her unit, she did not want to be evicted. So, she figured if she came (indiscernible) then we would have her stay. Unfortunately, this is a pattern of what everyone else does."

Next, the plaintiff's counsel called to the witness stand Brian Dixon, the housing coordinator for the plaintiff who was in charge of overseeing the defendant's building. Dixon explained that he had drafted the document that had been admitted into evidence as exhibit 7. Dixon was asked whether Brown was "coerced in any way in speaking to [him]," to which he replied, "[n]o," and that, in his opinion, Brown had spoken with him voluntarily.

Finally, the plaintiff presented testimony from Frank Healy, who works for the plaintiff as an information technology manager. Healy had reviewed eighteen to twenty days of video footage of the defendant's unit, and he documented what had occurred by taking notes regarding his observations. The documents of his observations were

---

[5] Although the handwritten notes offered by the plaintiff that were admitted into evidence each purportedly were signed by Brown and Rivera, those notes, which were informal in nature, were neither sworn to nor made under oath.

admitted into evidence. The documents showed that multiple people, including tenants, visited the defendant's unit at various times of the day, for various lengths of time, and some on multiple occasions. For example, one document, dated March 3 and 4, 2024, shows that there were twenty-seven visits to the defendant's unit, many of which lasted less than five minutes. The plaintiff also offered two other videos, which were admitted into evidence, one of which showed Mathis leaving the defendant's unit on December 29, 2023, going to the elevator and then entering Rivera's unit, and a second that showed the paramedics bringing Mathis' body out of Rivera's unit and trying to revive him, which occurred on the same day, approximately two hours after he left the defendant's unit.

After the plaintiff rested, the defendant sought to admit documents that were "signed . . . statements," which allegedly showed that the plaintiff "put words" in the mouths of the tenants who had submitted notes to the plaintiff. The plaintiff's counsel, however, objected on the ground that the documents offered by the defendant were from third parties who were not present to testify and, thus, constituted hearsay. The court agreed with the plaintiff's counsel and declined to admit the proffered evidence.[6] The defendant testified and denied selling

---

[6] In its principal appellate brief, the plaintiff asserts that, "since Brown, Mathis, and Rivera were all evicted there is nothing to support the notion that the [plaintiff] made any promises to them or agreed to stop their respective evictions if they provided statements," that "the defendant did not provide a single witness or document to suggest otherwise," and that the defendant "offered nothing as to what the other tenants were told or promised in exchange for making their statements." I find these assertions to be disingenuous given what occurred at trial. The plaintiff offered evidence of hearsay statements from various tenants regarding the defendant's alleged drug activity in her unit, and that evidence was admitted either because the self-represented defendant did not object or because she did not raise a proper basis for the court not to admit the evidence, likely due to her self-represented status. Yet, when the defendant proffered evidence that similarly included hearsay from individuals who were not testifying, the plaintiff's counsel objected to the admission of that evidence on hearsay grounds, and the court sustained the objection. According to the defendant, the "signed . . .

drugs, and she was cross-examined by the plaintiff's counsel. Following the conclusion of trial, the court rendered judgment in favor of the defendant, concluding that the plaintiff had not met "its burden of proof regarding the substance of the [defendant's] noncompliance with the lease, the nuisance alleged, or the serious nuisance alleged." This appeal followed.

In its opinion, the majority states that the trial court, in its memorandum of decision dated October 2, 2024, determined that "the written statements by former tenants were 'likely made in duress' and discredited them." The majority concludes that the trial court's finding of duress is clearly erroneous because there was no evidence in the record to support it. See part I of the majority opinion.

First, I believe that the majority does not provide the full context of the court's decision not to credit the handwritten notes of the former tenants, which the court referred to in its decision as "letters" from the former tenants.[7] In its memorandum of decision, the court stated: "To support its case, the plaintiff called as witnesses representatives from the [plaintiff] . . . . These witnesses testified regarding two violent altercations

---

statements" that she had proffered would have showed that the plaintiff "put words" in the mouths of the tenants who had submitted statements to the plaintiff. The defendant expressed her confusion and dismay at not being able to present the hearsay statements given that the plaintiff had done so, stating: "[The plaintiff is] going by statements, just the same thing I have, statements. That's the same thing they presented to the court, which is false statements, Your Honor. . . . [T]hey had evicted so many people that [came] to my apartment only, only [the ones that came] to my apartment, because they wanted statements from these people to testify or to say something against me . . . . Your Honor, I wish—oh my God, I didn't know. I thought I could just get these statements. I didn't know." Thus, contrary to the plaintiff's assertions, the defendant did try to offer documentary evidence demonstrating the circumstances under which the other tenants provided statements to the plaintiff but was precluded from doing so, even though similar evidence offered by the plaintiff was admitted at the trial, which thereby demonstrates the hazards of self-representation.

[7] For consistency with the trial court's decision, I refer to the handwritten notes collectively as letters of the former tenants, as well.

involving other tenants that occurred while the individuals were leaving the defendant's unit, as well as the foot traffic to and from the defendant's unit. These were the only witnesses who testified in this matter for the plaintiff. The plaintiff submitted letters from tenants who had been evicted or no longer resid[ed] in the premises as proof of the defendant's drug selling. The court did not find those statements to be credible as they were most likely made in duress *and* not one resident, past or current, was present to testify in the multiday trial." (Emphasis added.) Therefore, with respect to the basis for the court's determination not to credit the former tenants' letters, the court provided *two* reasons as to why it did not find those letters to be credible, namely, "they were most likely made in duress *and* not one resident, past or current, was present to testify in the multiday trial." (Emphasis added.)

I also believe that the trial court's statement regarding the failure of any of the former tenants to testify, when considered in conjunction with the court's statements surrounding the admission of the letters during trial, further demonstrates that the court made the determination not to credit or assign any weight to the information contained in the letters made by the nontestifying witnesses that were admitted into evidence because they (1) were likely made under duress and (2) included hearsay statements and the court did not have the benefit of evaluating the witnesses who made the statements in the letters or evaluating the circumstances under which the statements were made. As I already have noted, the hearsay statement in Brewster's handwritten note had been admitted into evidence without objection by the self-represented defendant. When the plaintiff offered Rivera's handwritten note into evidence, the court, which already had cautioned the plaintiff's counsel regarding "third-party statements being brought into court without the witness being present," asked the defendant if she had an objection, and the defendant expressed confusion and disagreement with the contents of Rivera's handwritten note, which the court considered to be an objection.

Nevertheless, because the defendant did not provide an evidentiary or legal reason as to why she believed that the court should not review the document, the court admitted Rivera's handwritten note into evidence, stating: "I'm going to allow the document to come in as a full exhibit; however, I'm going to give it the weight that it deserves in light of your objection." Subsequently in its decision, the court again stated that it was not persuaded by the "letters" presented by the plaintiff.

Even though the trial court admitted the former tenants' letters into evidence in the absence of a proper objection by the self-represented defendant, that did not mean that the court had to afford any particular weight to that evidence. See *State* v. *Smith*, 179 Conn. App. 734, 766, 181 A.3d 118 ("the court's ruling that the evidence was admissible did not affect the weight that the [fact finder] should afford the evidence"), cert. denied, 328 Conn. 927, 182 A.3d 637 (2018). When, as in the present case, a court has conflicting evidence before it—here, the hearsay statements in the letters of the former tenants that the defendant was selling drugs, versus the defendant's testimony denying that she sold drugs—it is the function of the fact finder to determine which version to believe. See *Finkelstein* v. *45 Lake Drive, LLC*, 235 Conn. App. 740, 752, 347 A.3d 303 ("[i]t is the exclusive province of the trier of fact to weigh the conflicting evidence" (internal quotation marks omitted)), cert. denied, 353 Conn. 932, 346 A.3d 516 (2025). Moreover, it was within the discretion of the court not to credit the information in the former tenants' letters on the ground that the persons who provided those letters did not testify. See *Gleason* v. *Atkins*, 225 Conn. App. 745, 778, 317 A.3d 1168 ("'[i]t is well settled that [t]he weight to be given the evidence and the credibility of the witnesses are within the sole province of the trial court'"), cert. denied, 350 Conn. 901, 322 A.3d 1059 (2024); see also *Hudson City Savings Bank* v. *Hellman*, 234 Conn. App. 45, 67, 343 A.3d 781 ("it is not our role to second-guess [the trial court's] credibility determinations" (internal quotation marks omitted)), cert. denied,

353 Conn. 920, 345 A.3d 809 (2025); *State* v. *Chemlen*, 165 Conn. App. 791, 820, 140 A.3d 347 ("[t]he weight to afford evidence is within the exclusive purview of the trier of fact, and we must defer to the [trier of fact's] credibility assessment"), cert. denied, 322 Conn. 908, 140 A.3d 977 (2016).

Consequently, I do not believe that this court needs to address the plaintiff's claim that the trial court's finding of duress was clearly erroneous, as the court provided a second basis for its decision not to credit the former tenants' letters, which the plaintiff has not challenged on appeal, and that decision involved a matter that was within the sound discretion of the court to make.[8]

I also disagree with the conclusions in part II of the majority opinion that the trial court improperly required

[8] Nevertheless, I am not entirely satisfied, following my review of the record, that there is no evidentiary basis for the trial court's finding of duress, or that the finding rested on speculation, as the majority concludes. The majority explains that "[t]he defendant testified only that statements by former residents were 'false' and that the plaintiff wanted the former residents to testify against her. The defendant said that Naughton had somehow fabricated the statements against her by former residents, suggesting that there had been some type of agreement between the plaintiff and the former residents. The defendant offered no independent knowledge of any agreement between the plaintiff and former residents and offered no testimony to allow the court to infer that such an agreement had been made. Further, the defendant proffered no evidence of any act, threat, or misconduct by the plaintiff that would compel the former residents to offer statements against the plaintiff." See part I of the majority opinion. The majority's analysis, however, fails to take into account Naughton's testimony that (1) Mathis reached out to her "about trying to remain [in] the building" after eviction proceedings against him had been commenced; (2) "all the tenants that [were] facing eviction, once they're facing eviction, they want to stay . . . [and] [s]o, what they did was they actually put . . . in writing [about buying drugs from the defendant], hoping that [the plaintiff] would say, okay, you know what, you can stay based on the information [you just gave to the plaintiff about the defendant]"; (3) when Brewster provided her statement, "she was also going to be evicted"; and (4) Rivera "did not want to get evicted . . . [and] figured [that] if she came (indiscernible) then we would have her stay. Unfortunately, this is a pattern of what everyone else does." At a minimum, this testimony demonstrates that the former tenants' letters accusing the defendant of dealing drugs out of her unit were written when those tenants were under threat of

the plaintiff to submit direct evidence to establish its serious nuisance claim, and that the trial court's findings that there existed no evidence regarding the defendant's alleged drug activity in the unit and that the defendant had engaged in or allowed others to engage in violence in her unit were clearly erroneous.

In concluding that the plaintiff had failed to meet its burden as it relates to the allegation that the defendant sold or allowed the sale of illegal drugs in her unit, which was one of the grounds on which the serious nuisance claim was based, the trial court stated: "There was no evidence presented that the defendant was engaged in or allowed the illegal sale of drugs on the subject premises. The court was not persuaded by the letters presented by the plaintiff, *and there was no direct evidence that the third-party tenant's death was a result of purchasing illegal drugs from the defendant.* Additionally, no illegal drugs, paraphernalia, or items related to the sale of illegal drugs were found in the defendant's unit. Further, there was no police involvement, investigation, or the observation of the sale of illegal drugs in or around the subject premises. . . . The defendant's unit had an unreasonably high amount of traffic from individuals visiting at all hours of the day and night for brief durations of time;

eviction, which suggests an element of coercion regarding the production of those letters and provides a reasonable basis for such an inference. Moreover, at trial the plaintiff countered the defendant's claim that the statements offered by the plaintiff had been coerced when, on direct examination of Dixon, the plaintiff's counsel asked Dixon whether Brown was "coerced in any way in speaking to [him]," to which Dixon replied, "[n]o," and that, in his opinion, Brown had offered her statements voluntarily. The court, however, as the fact finder in this case, did not have to credit Dixon's testimony. See *Gleason* v. *Atkins*, supra, 225 Conn. App. 778.

I am also not persuaded that the trial court's use of "in duress" requires evidence of an agreement between the plaintiff and the former tenants who wrote letters. I think the court's finding that the tenants made the statements "in duress" can cover the situation we have here, in which all of the tenants were trying to avoid eviction, which also was consistent with the language in the defendant's special defense—"[e]verything that was said about me was by a third part[y] and signed by several people in order to keep their apartment."

however, that alone does not lead to the conclusion that the defendant is selling illegal drugs or allowing her premises to be used for that purpose. Thus, the plaintiff has not met its burden of proving, by a fair preponderance of the evidence, the substance of the serious nuisance complained of, namely, that the defendant engaged in or allowed the premises to be used for the sale of illegal drugs or within 1500 feet of the subject premises." (Citation omitted; emphasis added.)

It is clear from the trial court's decision that its "no direct evidence" statement related only to the lack of direct evidence tying Mathis' death to the selling of illegal drugs by the defendant; the court did not require the plaintiff to present direct evidence to establish its serious nuisance claim. Moreover, because the record does not contain direct evidence establishing that Mathis' death was the result of his purchase of illegal drugs from the defendant, the court's "no direct evidence" finding pertaining to Mathis is not clearly erroneous. Additionally, I do not agree that the trial court determined that there was no evidence of the defendant's alleged drug activity due to a lack of direct evidence alone.

As a result of its conclusion that the trial court required the plaintiff to present direct evidence to establish its serious nuisance claim, the majority concludes that, because there was testimonial and circumstantial evidence before the court, and, "because there is no legal distinction between circumstantial and direct evidence . . . the [trial] court's finding that there existed 'no evidence' regarding the defendant's alleged drug activity in the unit was clearly erroneous." See part II of the majority opinion. Again, my review of the record does not support this conclusion. Even though the trial court did state that there "was no evidence presented that the defendant was engaged in or allowed the illegal sale of drugs on the subject premises," the court ultimately found that the plaintiff failed to meet its burden of proof of demonstrating, by a fair preponderance of the evidence, that the defendant sold or allowed the sale of

illegal drugs in her unit. The court made that determination on the basis of a number of grounds, including (1) "[t]he court was not persuaded by the letters presented by the plaintiff"; (2) "there was no direct evidence that [Mathis'] death was a result of purchasing illegal drugs from the defendant"; (3) there was no evidence presented of "illegal drugs, paraphernalia or items related to the sale of illegal drugs . . . found in the defendant's unit"; (4) there was no evidence presented as to "police involvement, investigation or the observation of the sale of illegal drugs in or around the subject premises"; and, (5) although there was evidence presented that showed "an unreasonably high amount of traffic" to and from the defendant's unit "at all hours of the day and night for brief durations of time . . . that alone [did] not lead to the conclusion that the defendant [was] selling illegal drugs or allowing her [unit] to be used for that purpose."

My review of the trial court's decision leads to the conclusion that the court considered what little evidence it had before it and determined that it was not sufficient to meet the plaintiff's burden of proof on this issue. The record demonstrates, contrary to the conclusion of the majority, that the trial court did consider the direct and circumstantial evidence presented. The trial court, after stating that it was not persuaded by the notes and pointing out the evidence that was not presented, namely, evidence linking Mathis' drug overdose to the purchase of drugs from the defendant, of drug dealing in the defendant's unit or police activity, addressed the only evidence before it relating to the defendant's alleged drug dealing—the high foot traffic evidence—which it considered and concluded was not enough to satisfy the plaintiff's burden of proof with respect to the claim of drug dealing by the defendant.

Notably, the court's decision not to afford weight to the former tenants' letters and hearsay statements implicating the defendant in drug dealing from her unit, which the court was within its discretion to do, factored into the court's ultimate determination that the plaintiff

failed to meet its burden of proof. "As the finder of fact, the court is responsible for weighing the evidence. It is the [fact finder's] right to accept some, none or all of the evidence presented. . . . It is the [finder of fact's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses." (Internal quotation marks omitted.) *Hudson City Savings Bank* v. *Hellman*, supra, 234 Conn. App. 66. As an appellate court reviewing whether the trial court's factual findings underlying its determination that a party has failed to sustain its burden of proof are clearly erroneous, we must "not invade the factfinding province of the trial court or disturb its legal conclusions when they are sufficiently supported by the evidence before it . . . [as] the weight and credibility to be accorded witnesses [and evidence] is totally within the purview of the trier of fact." (Citation omitted.) *Francoline* v. *Klatt*, 26 Conn. App. 203, 210, 600 A.2d 8 (1991), cert. granted, 221 Conn. 913, 603 A.2d 404 (1992) (appeal withdrawn April 1, 1992); see also *Hadji* v. *Snow*, 232 Conn. App. 829, 851, 339 A.3d 1168 (in reviewing underlying factual determinations of trial court under clearly erroneous standard, we must defer to court's credibility determinations), cert. denied, 353 Conn. 902, 341 A.3d 958 (2025); *Kohl's Dept. Stores, Inc.* v. *Rocky Hill*, 219 Conn. App. 464, 494, 295 A.3d 470 (2023) ("[t]he trial court, as the fact finder, is privileged to accept, in whole or in part, *whatever* testimony [or evidence] it reasonably believes to be credible" (emphasis in original)).

As a consequence of the majority's determination that the trial court's failure to credit the former tenants' letters and hearsay statements was based on a clearly erroneous finding of duress, and its resulting failure to recognize that the trial court's decision not to credit the former tenants' letters was based on its discretionary determination not to afford any weight to hearsay statements in letters from nontestifying witnesses, the majority entirely discounts the court's statement that it "was not persuaded by the letters presented by the plaintiff," which formed the basis, in part, for its finding

that the plaintiff did not meet its burden of proof on the issue of the defendant's alleged involvement in drug dealing. I believe that the majority, in doing so, improperly invaded the province of the trial court as the fact finder in this case.[9]

Next, I turn to the majority's conclusion that the trial court's "finding that there was 'no evidence' that the defendant had engaged in or allowed others to engage in violence in her unit . . . is clearly erroneous." See part II of the majority opinion. The majority bases this conclusion on video evidence of "two violent altercations that appear to begin in the defendant's unit," as well as the defendant's testimony confirming that, on December 7, 2023, she had asked Rivera to remove Brown from her unit and that Rivera did so by dragging Brown out of the unit by her hair. With respect to this issue, the trial court made the following findings: "The court reviewed evidence of other tenants engaging in dangerous and violent activities mainly in the hallways and elevator of the building; however, there was no evidence of the defendant's involvement in the violence that took place, only that the parties left the defendant's unit prior to the incidents taking place. Further, the defendant's attempt to clean the blood from her door and hallway does not reflect participation in the violence. The individuals involved in the violent altercations that took place were third-party tenants who did not reside in the defendant's unit and were not subject to the terms of the defendant's lease. They were not just 'guests' of the defendant's unit, but tenants of the plaintiff who were bound to the terms of their individual lease agreements. The tenants involved in the December 7, 2023 incident were all subsequently evicted from the premises. The defendant herself was not engaged in conduct [that] presented an immediate

[9]The majority states in a footnote that "[w]hether the evidence on remand, including statements attributed to tenants, should be credited remains the sole province of the trier of fact." See footnote 15 of the majority opinion. This statement ignores the fact that the trial court already found that the former tenants' letters should not be credited because "not one resident, past or current, was present to testify" and it did not find the letters persuasive.

and serious danger to the safety of other tenants or the landlord, and there is insufficient evidence to establish that she failed to act and/or caused her guests to conduct themselves in a manner that disturbs her neighbor's quiet enjoyment of the premises. Thus, the plaintiff has failed to meet its burden regarding the defendant's involvement in the incident that took place on December 7, 2023."

First, I believe that the majority is incorrect in stating that there was video evidence of "*two* violent altercations that appear to begin *in* the defendant's unit." (Emphasis added.) See part II of the majority opinion. As the trial court noted in its memorandum of decision, the video evidence before it concerned two incidents of violence: "[t]he first incident of violence recorded took place on December 7, 2023, when a tenant residing in the premises was dragged out of the defendant's unit by another tenant," and a second incident concerned "another violent altercation that took place after another tenant and another individual *left* the defendant's unit." (Emphasis added.) As a result, there was evidence of only one incident that appeared to begin in the defendant's unit, the December 7, 2023 incident.

I believe the trial court's finding that there was no evidence presented of the defendant's involvement in the violence that took place is correct. The majority's conclusion mischaracterizes the trial court's decision. The trial court concluded that "there was no evidence of the *defendant's* involvement in the violence that took place"; it did not find, as the majority concludes, that the plaintiff "proffered no evidence" in support of its allegation that the defendant engaged in or allowed others to engage in violence in her unit. In other words, the court examined and considered the evidence presented by the plaintiff to support this allegation, which included, inter alia, the video evidence, as well as the defendant's attempt to clean the blood from the door to her unit, which the trial court found did not reflect the defendant's participation in the violence. Ultimately, however, the court found that the evidence presented

did not show that the defendant engaged in violence. As the court aptly noted, the video footage showed that the individuals had left the defendant's unit prior to engaging in the violent altercation in the hallway that resulted in a stabbing. With respect to the December 7, 2023 incident, the court explained that the individuals involved in that incident were tenants, not guests of the defendant, and as tenants, they were bound to the terms of their individual lease agreements, as demonstrated by the fact that both tenants subsequently were evicted from the development. I agree with the trial court that the plaintiff did not present evidence demonstrating that the defendant herself had engaged in conduct that presented an immediate and serious danger to the safety of other tenants in the building. It is apparent from the court's decision that it was not convinced that the evidence showing that the defendant told Rivera to remove Brown from her unit demonstrated that the defendant failed to act and/or caused her guests to conduct themselves in a manner that disturbs her neighbor's quiet enjoyment of the premises, especially given the court's determination that the individuals involved were fellow tenants, not necessarily "guests." See *Gleason* v. *Atkins*, supra, 225 Conn. App. 778–79 (" '[a]lthough there may be evidence in the record that would support the [plaintiff's] position, it is not the role of this court to examine that evidence and substitute our judgment for that of the trial court' "). Consequently, I do not believe that the trial court's finding that the plaintiff failed to meet its burden of establishing this allegation in support of its serious nuisance claim is clearly erroneous.

The clearly erroneous standard of review is a deferential one, under which "[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . The [fact-finding] function is vested in the trial court with its unique opportunity to view the evidence

presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." (Citation omitted; internal quotation marks omitted.) *O & G Industries, Inc.* v. *American Home Assurance Co.*, 204 Conn. App. 614, 624–25, 254 A.3d 955 (2021). "A court's determination is clearly erroneous [when] the record contains no evidence to support it, or [if there is evidence] . . . the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Vance* v. *New Haven*, 236 Conn. App. 724, 736, 349 A.3d 1116 (2025). "In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Jordan*, 236 Conn. App. 168, 175, 347 A.3d 912 (2025), cert. denied, 354 Conn. 903, 349 A.3d 18 (2026).

I believe that the majority fails to adhere to this deferential standard. Specifically, the record supports the court's findings that the plaintiff failed to meet its burden of proof of establishing the allegations that the defendant sold or allowed the sale of illegal drugs in her unit, that she engaged in violent conduct that presented an immediate and serious danger to the safety of other tenants or the landlord, and that she failed to act and/or caused her guests to conduct themselves in a manner that disturbs her neighbor's quiet enjoyment of the premises, which were the grounds alleged by the plaintiff in support of its serious nuisance claim. For that reason, I am not left with a definite and firm conviction that a mistake has been made. I believe that the court's finding that the plaintiff failed to meet its burden of proof regarding its serious nuisance claim is not clearly erroneous and must be upheld. See *Woodbridge Crossing Condominium Assn., Inc.* v. *Ferguson*, 229 Conn. App. 99, 104, 325 A.3d 1205 (2024).

Finally, because I do not believe that the trial court's findings are clearly erroneous, I do not agree that we need

to address the issue of harm. I note, nevertheless, that in part III of the majority opinion addressing the issue of harm, the majority concludes, in part, that, because the trial court did not find the former tenants' letters to be credible on the basis of its clearly erroneous finding of duress, a new hearing is warranted. As I stated previously, the court identified two reasons as to why it did not credit the former tenants' letters: (1) the letters most likely were made under duress and (2) not one resident, past or current, was present to testify about the contents of those letters. Therefore, even if I were to agree that the court's finding of duress is clearly erroneous, any such error pertaining to that finding is harmless, as the court's decision not to credit the former tenants' letters also was based on a second, unchallenged ground that involved a matter within the court's discretion.

Accordingly, I respectfully dissent.